## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| GARMIN WURZBURG GMBH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:14-cv-02006-PPS-CAN |
| | ) | |
| AUTOMOTIVE IMAGINEERING & | ) | |
| MANUFACTURING, LLC, EXPRESSO | ) | |
| SATELLITE NAVIGATION, INC., EXPRESSO | ) | |
| SATELLITE NAVIGATION, LTD., MICHAEL | ) | |
| ARONEY, and KELLY ARONEY, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Garmin Wurzburg GmbH brought this action to confirm and enforce an

arbitration award and to pierce the corporate veil of Defendant Automotive

Imagineering & Manufacturing, LLC ("AIM") to hold its principal and sole owner,

Michael Aroney, personally liable. Garmin also claims that Aroney and his wife Kelly

committed fraud when they induced Garmin to deliver software to them without

paying for it. Garmin previously moved for summary judgment to confirm the

arbitration award, which I granted, and for which final judgment has already been

entered. Garmin subsequently moved for partial summary judgment on its piercing the

corporate veil claim against Michael Aroney, and Michael and Kelly Aroney moved for

partial summary judgment on Garmin's fraud claim against them. For the reasons

discussed below, both motions will be granted so the fraud claim will be dismissed and

Garmin will be allowed to pierce the corporate veil.

## BACKGROUND

Garmin[1] is a German corporation with its principal place of business in that

country. [DE 27 at ¶7.] It entered into a software license agreement with AIM whereby

Garmin agreed to develop software and license it to AIM, and AIM agreed to pay an

initial fee, a fee for the software, and annual licensing fees. [DE 73-2 at 67.] The parties

agreed to arbitrate legal disputes arising out of the transaction. [*Id.* at 81.] Specifically,

the parties agreed to arbitrate in Chicago through the American Arbitration Association

and to award the prevailing party all costs and fees connected to both the arbitration

and enforcement of any arbitration award. [*Id.*]

AIM is a Michigan company and its only shareholder and officer is Michael

Aroney. [DE 58 at 4.] Kelly Aroney is Michael's wife and has performed bookkeeping

for AIM from time to time. [*Id.*] Expresso Satellite Navigation, Ltd. was formed in

Hong Kong in July 2009 by AIM and a company called Sky River, each owning about

half, with AIM nominating one director (it chose Michael Aroney) and Sky River

nominating two. [DE 71-1 at 22.] (I'll call this company "Expresso HK.") Expresso

Satellite Navigation, Inc. was formed in Indiana in August 2010 by sole shareholder

Expresso HK, with the same directors as Expresso HK and Michael Aroney as its

President. [*Id.*] For ease of reference, I'll refer to Expresso Navigation, Inc. as "Expresso

---

[1] When it made the deal described below, Garmin was called Navigon; it
changed its name in January 2012. [DE 71-1 at 22.] For ease of reference I will use the
name Garmin throughout this opinion.

Indiana."

To make a long story short, Garmin did a lot of work, delivered the software to the Defendants, and were promptly stiffed. After the Defendants failed to pay $749,630 in licensing fees, the parties participated in an arbitration proceeding pursuant to the License Agreement. [DE 71-1 at 20-30.] On July 31, 2014, the arbitrator awarded Garmin a "partial final award" of $1,090,014.61 for which the corporate defendants — AIM, Expresso HK, and Expresso Indiana — were jointly and severally liable. [*Id.* at 28-29.] This included the $749,630 in unpaid licensing fees and $340,384.61 in interest on that amount. [*Id.*] Garmin also was awarded future interest at 12 percent per year on the unpaid licensing fees until those fees were paid in full. [*Id.*] Finally, the corporate defendants were ordered to pay certain to-be-determined fees and costs of the arbitration pursuant to the License Agreement. [*Id.* at 29.] A "final award" signed on September 4, 2014, included legal costs of $198,039.38, plus interest, and reimbursement of $32,588 in arbitration fees already paid by Garmin. [*Id.* at 32-35.]

Shortly after filing this case, Garmin moved for summary judgment on Count I of its complaint, arguing that it is entitled to confirmation of the arbitration award and that the corporate defendants are liable for fees and costs in enforcing the award. [DE 29.] The Defendants responded by stating they did not oppose the motion but making it clear that enforcement of the arbitration award applies only to the corporate defendants, not the Aroneys individually. [DE 52.] So I granted Garmin's motion for summary judgment on Count I, confirming the arbitration award. Garmin then moved for

certification under Federal Rule of Civil Procedure 54(b) directing entry of final judgment confirming Garmin's arbitration award against the corporate defendants, which I granted. [DE 65.]

After taking additional discovery on the remaining counts, the parties now have filed cross motions for summary judgment. Michael and Kelly Aroney seek summary judgment on Count III of the second amended complaint — the count alleging fraud. For its part, Garmin seeks summary judgment on Count II of the second amended complaint — the piercing the corporate veil count where Garmin is attempting to hold Michael Aroney jointly and severally liable for AIM's debts and obligations.

### Discussion

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A nonmoving party is not entitled to the benefit of "inferences that are supported by only speculation or conjecture." *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (citations and quotations omitted).

I will begin by addressing the fraud claim. Much of the briefing by the parties is spent arguing which state law — Illinois or Indiana — applies to this claim. Because this is a case invoking diversity jurisdiction, I am tasked with determining what law

applies by considering the conflict-of-laws rules of Indiana, the state in which I sit. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). Michael and Kelly Aroney argue that Indiana law applies because the allegedly fraudulent statements they made were uttered from their office in LaPorte, Indiana. [DE 70 at 10 n.4; DE 69 at 15 n.4; DE 80 at 2-7; DE 81 at 4-8.] Garmin argues that Illinois law applies because the injury occurred in Illinois, where Garmin asserts it was located. [DE 76 at 11-12.]

The Aroneys have the better of the argument since, under Indiana law, the most important factor when considering choice of law in a tort case is "where the conduct causing the injury occurred." *Simon v. United States*, 805 N.E.2d 798, 806-07 (Ind. 2004). Any fraudulent act by Mr. Aroney took place in LaPorte, Indiana and so Indiana law most likely should apply. I say "most likely" because, while interesting, the dispute over what state law applies is academic as there is no difference between Illinois and Indiana law in this area. Both states bar fraud claims where the damages arising from the fraud claim are not separate and distinct from the damages resulting from a breach of contract. *See, e.g., Epperly v. Johnson*, 734 N.E.2d 1066, 1073 (Ind. Ct. App. 2000) (finding that the plaintiff's fraud claim failed because the defendant's misrepresentation was merely a breach of the parties' contract and "[t]he misrepresentation did not result in injury distinct from that resulting from the breach, and it thus is not independently actionable as fraud"); *Tobin v. Ruman*, 819 N.E.2d 78, 86 (Ind. Ct. App. 2004) (upholding the trial court's grant of summary judgment in favor of defendant on a fraud claim where the fraud claim was "merely a repackaged version of [the plaintiff's] breach of

contract claim"); *Johnson v. George J. Ball, Inc.*, 248 Ill. App. 3d 859, 867, 617 N.E.2d 1355, 1361 (Ill. App. Ct. 1993) ("Generally, a party may not recover in tort for what is essentially a breach of contract."); *Smith v. Prime Cable of Chicago*, 276 Ill. App. 3d 843, 855, 658 N.E.2d 1325, 1335 (Ill. App. Ct. 1995) ("The failure to perform in the manner promised resulted in one of the parties not receiving the benefit of their bargain, the remedy of which is a breach of contract action not an action for fraud.")

It is true that Illinois recognizes an exception where a plaintiff is fraudulently induced to enter into the contract in the first place. *See Johnson v. George J. Ball, Inc.*, 248 Ill. App. 3d 859, 867, 617 N.E.2d 1355, 1361 (Ill. App. Ct. 1993). But that doctrine is neither here nor there for our purposes because Garmin's second amended complaint does not allege that it was fraudulently induced into entering into the License Agreement. Its beef is with what the Aroneys may have done during the *performance* of the License Agreement. The allegedly fraudulent acts all occurred after the parties signed the License Agreement. So with that nuance in Illinois law brushed away, there is no meaningful distinction between Illinois and Indiana law.

There is an obvious incentive to convert a breach of contract claim into a fraud claim. Fraud claims allow for enhanced damages, including punitive damages. But to allow this would be to undermine contract law. *See All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 865 (7th Cir. 1999) ("Where there are well-developed contractual remedies . . . there is no need to provide tort remedies for misrepresentation. The tort remedies would duplicate the contract remedies, adding unnecessary complexity to the

6

law. Worse, the provision of these duplicative tort remedies would undermine contract law.")

Garmin's fraud claim against Michael and Kelly Aroney is simply a restyled breach of contract claim, which Garmin already successfully arbitrated and had the award confirmed by this Court. Specifically, Garmin alleges that Michael Aroney repeatedly made false statements about the status of AIM's payments to Garmin, including that Expresso HK was owned by AIM and would be assuming responsibility for AIM's payment obligations under the License Agreement, for the purpose of inducing Garmin to deliver the master copy of the software it developed. [DE 57 at ¶¶42, 44; DE 76 at 13-14.] Garmin also alleges that Kelly Aroney conspired with Michael Aroney to defraud Garmin by, among other things, concealing her relationship with Michael Aroney in communications with Garmin and, like Michael Aroney, authoring deceptive emails to Garmin regarding the status of AIM's payments. [DE 57 at ¶¶39-41, 45, 47; DE 76 at 15-16.] While some of the evidence offered by Garmin is certainly fishy, it does not change the fact that the Defendants' actions were part and parcel of their breach of the contract between them and Garmin. And Garmin already has been awarded damages to make it whole for these wrongs, specifically AIM's failure to meet its payment obligations under the License Agreement.

I note that the contract that was breached, the License Agreement, was between Garmin and the corporate defendants, not the Aroneys. As I will address next, however, AIM is a sham entity and a mere instrumentality of Michael Aroney, who is

7

jointly and severally liable for the damages resulting from AIM's breach of the License

Agreement. Furthermore, even if this were not the case (as it is not for Kelly Aroney,

against whom the veil is not pierced), Garmin's fraud claim against the Aroneys is

based on a series of misrepresentations stemming from and about the License

Agreement and Garmin should not receive a windfall in the form of double recovery by

pursuing damages for the same harm via two different claims. *See Tobin*, 819 N.E.2d at

86. For these reasons, Michael and Kelly Aroney's motions for summary judgment on

Count III of the second amended complaint are granted.

I now turn to Garmin's piercing the corporate veil claim. Count II of the second

amended complaint seeks to pierce the corporate veil of AIM and hold Michael Aroney

personally liable for the arbitration award entered against AIM. First, I must determine

what law applies to this claim. Veil piercing is a separate equitable doctrine that does

not depend on the contract at issue. I previously grappled with this choice of law issue

in *Chapel Ridge Investments, L.L.C. v. Petland Leaseholding Co.*, No. 1:13-CV-00146-PPS,

2013 WL 6331095, at *2 (N.D. Ind. Dec. 4, 2013). In that case, I decided that absent a

statement of settled law in Indiana directly addressing which state's law applies when

the corporate veil is at risk of being pierced, a trial court should proceed by the general

principle that "in the vast majority of situations, the law of the state of incorporation

governs attempts to disregard the corporate entity." *Chapel Ridge Investments, L.L.C.*,

2013 WL 6331095, at *2 (quoting *Secon Serv. Sys. v. St. Joseph Bank & Trust Co.*, 855 F.2d

406, 413 (7th Cir. 1988)). Because AIM is a limited liability company organized under

the laws of Michigan, Michigan law will apply to Garmin's veil piercing claim.

Under Michigan law, to pierce the corporate veil, a complainant must establish

that:

> (1) the entity was the mere instrumentality of the owner, (2) the owner
> exercised his or her control in such a manner as to defraud or wrong the
> complainant in some way, and (3) the complainant would suffer an unjust
> loss or injury unless the court disregards the existence of the entity as
> separate from its owner.

*Green v. Ziegelman*, 310 Mich. App. 436, 454-59, 873 N.W.2d 794, 805-808 (Mich. Ct. App.

May 7, 2015). "Under Michigan law, there is a presumption that the corporate form will

be respected. . . . The propriety of piercing the corporate veil is highly dependent on the

equities of the situation, and the inquiry tends to be intensively fact-driven." *Servo*

*Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 798 (6th Cir. 2007). "Factors

used by courts to determine the propriety of piercing the corporate veil include: (1)

whether the corporation is undercapitalized, (2) whether separate books are kept, (3)

whether there are separate finances for the corporation, (4) whether the corporation is

used for fraud or illegality, (5) whether corporate formalities have been followed, and

(6) whether the corporation is a sham." *Glenn v. TPI Petroleum, Inc.*, 305 Mich. App. 698,

716, 854 N.W.2d 509, 520 (Mich. Ct. App. 2014).

Weighing all of the factors and the evidence, AIM's corporate veil should be

pierced and Michael Aroney should be held jointly and severally liable for the

arbitration award to Garmin. The evidence establishes that AIM was the mere

instrumentality of Michael Aroney. The record shows that AIM essentially was Michael

Aroney and two bank accounts, and Michael Aroney and his wife frequently relied on those accounts for personal expenses. Starting with the corporate structure, AIM has not observed any corporate formalities. *See Dietrich v. Stephens*, No. 05-cv-72113, 2010 WL 1286204 at *6 (E.D. Mich. Mar. 30, 2010) (piercing the corporate veil where a LLC was not capitalized, there were no records or books, and the LCC only had one member and manager, who funded the LLC's bank accounts to make payments on a promissory note); *Michigan Laborers' Health Care Fund v. Taddie Const.*, Inc., 119 F. Supp. 2d 698, 703 (E.D. Mich. 2000) (piercing the corporate veil where sole owner of a thinly-capitalized entity failed to comply with corporate formalities).

Michael Aroney is the President and sole member of AIM and AIM never has had any employees. [DE 73-1 at 54, 56.] Yet Michael Aroney is entirely uncertain regarding certain operating issues of AIM including the existence of certain types of operating documents, such as those setting forth the manner in which AIM will make distributions to members, and the consistency with which AIM has paid annual franchise taxes to the State of Michigan. [DE 73-1 at 54-55.] Michael Aroney does not know whether AIM ever filed state or federal income taxes, is not aware of AIM ever issuing a W-2 , 1099, or K-1 to any person or entity, and does not remember ever giving anyone a financial statement. [DE 73-1 at 55.] There is no limited liability company agreement or operating agreement for AIM, no board minutes, and no shareholder resolutions. [DE 73-1 at 49.]

AIM's capitalization (or lack thereof) and financial expenditures also are

indicative that AIM was merely a shell organization for the benefit of Michael Aroney. AIM only has had two bank accounts since it was first established, one with Bank of America and one with Chase, and while Garmin requested production of all AIM bank statements for the period between January 1, 2009 and the present, AIM only produced Bank of America account statements from October 2010 through September 2011 and Chase account statements from October 2010 through March 2011 and January 2014 through March 2015. [DE 73-1 at 56-59, 78, 136.] Michael Aroney testified that he believes all bank statements in AIM's possession and control were produced. [DE 73-1 at 73.]

The account statements that *were* produced paint a questionable picture at best. First of all, they show that AIM was undercapitalized. During the one-year period commencing October 2010, the average month-end balance in AIM's Bank of America account was $713.72. [DE 73-2 at 97.] In January 2011, the month-end balance in the Bank of America account was $79.31, and in five other months during this period it was less than $300. [*Id.*] During the six-month period between October 2010 and March 2011, the average month-end balance in AIM's account was $1,023.35. [*Id.*] The License Agreement committed AIM to paying a $30,000 kick-off fee, prior to commencement of the project, at least $100,000 in the form of a Golden Master Fee for the actual software, and a minimum of $779,556 in annual license fees. [DE 73-1 at 69; DE 73-2 at 84.] At no point was AIM sufficiently capitalized to come anywhere close to meeting its obligations.

Furthermore, Aroney and his wife appear to have used AIM bank accounts as personal accounts. Many of the cash transfers and expenses reflected in the account statements, at least at first glance, appear to be of a personal nature. For example, between October 2010 and September 2011, AIM made 96 online cash transfers totaling over $25,000 from its Bank of America account to a third-party checking account ("Chk 8086"). [DE 73-1 at 78; DE 73-2 at 99.] Kelly Aroney thinks that the third-party account was the Aroneys' personal account and Michael Aroney believes it "may have been" but doesn't know who was initiating the transfers or what they were for. [DE 73-1 at 63-64, 76.] In addition, between October 2010 and August 2011, AIM made at least thirty ATM withdrawals from its Bank of America and Chase accounts totaling over $2,500. [DE 73-2 at 95.] On February 11, 2011, Michael Aroney wrote a $4,400 check payable to AIM and then deposited it into a personal account at New Buffalo Savings Bank. [DE 73-1 at 82.] Michael Aroney testified that AIM did not have an account at New Buffalo Savings Bank, but the Aroneys had a personal account there. [DE 73-1 at 64.] AIM also made payments on and off in 2010 and 2011 to Capital One Auto and Chase Auto in connection with a Prius that was titled in Michael Aroney's name and a Jeep that Mr. Aroney was using on a regular basis. [DE 73-1 at 65, 67, 84, 98, 109, 112, 127, 143, 145, 148, 151.] During this 2010-2011 time frame, AIM also made hundreds of purchases at dozens of different local food-service establishments such as Arby's, Burger King, KFC, Jimmy John's, McDonald's, and Wendy's using its Bank of America and Chase debit cards. [DE 73-2 at 89-93.] It also used these debit cards to make

12

purchases at establishments such as 7-11, Menard's, New Buffalo Pharmacy, the Dollar Tree, Lowe's, Wal-Mart, and the Gap Outlet. [DE 73-1 at 85, 102, 106, 141, 144-45.]

Turning to the 2014-2015 time frame, in 2014, AIM made 66 separate ATM-facilitated cash withdrawals totaling over $12,000. [DE 73-2 at 95.] Every month between January 2014 and February 2015 (except April 2014), AIM paid Wells Fargo Home Mortgage between $1,855.89 and $2,037.42. [DE 73-2 at 4, 9, 13, 23, 28, 33, 37, 41, 45, 49, 53, 57, 61.] Kelly Aroney confirmed that the Aroney's home mortgage was being paid through AIM on all of these occasions. [DE 73-1 at 77.] Every month between January 2014 and March 2015, AIM paid for at least one monthly Netflix subscription and from December 2014 through March 2015 AIM paid for two subscriptions. [DE 73-2 at 3, 7, 12, 17, 22, 27, 32, 36, 40, 44, 48, 52, 56, 60, 64.] Michael Aroney does not recall having a Netflix account under AIM. [DE 73-1 at 67.] During this 2014-2015 time frame, AIM also made hundreds of purchases at dozens of different local food-service establishments such as Arby's, Burger King, Buffalo Wild Wings, Chili's, IHOP, Pizza Hut, and McDonald's. [DE 73-2 at 91-93.] In the months of January 2014, July 2014, and March 2015, AIM purchased items from the Smoke Shop in LaPorte, Indiana. [DE 73-2 at 4, 32, 64.] In 2014, AIM also used its debit card to make purchases at the Dollar General and Dunham's Sports. [DE 73-2 at 23, 44.]

In response to this avalanche of compelling evidence that AIM was a mere instrumentality of Michael Aroney, Aroney submitted only two affidavits, one from himself and one from his wife. In his affidavit, Michael Aroney states the following:

13

I have reviewed the material Garmin filed on January 15, 2016, in support of its Motion for Partial Summary Judgment on its claim to pierce the corporate veil of AIM. With respect to the transfers and expense payments Garmin identifies at pages 4 through 6 of the Memorandum of Law it has filed, I do not have documentation to confirm the purpose or business basis for each transfer or expense payment because AIM's electronic records were irretrievably lost when the computer hard drive crashed, as explained in Paragraph 25 of this Affidavit. Morever, I cannot recall the specific purpose for each transfer or expense payment Garmin has identified. I do recall, however, that during the time frame Garmin has identified in its Motion for Partial Summary Judgment, there were many instances where AIM either directly paid or provided reimbursement to me for business related meals and entertainment expenses. For example, there were many instances where AIM paid or reimbursed me for the cost of travel and meals when I conducted meetings with AIM customer representatives, potential customers, vendor representatives, trade partners and automotive wheel industry representatives. There were also instances during the time frame Garmin has identified where AIM either directly paid or reimbursed me for automotive expenses given the fact that I used my personal vehicle for a significant amount of travel in connection with the business AIM was conducting. Any payment that might have been made from AIM's bank account to my home mortgage lender would need to be classified as loans to me personally if they cannot be classified as part of the compensation AIM was paying me for the services I was providing to the company.

[DE 75-6 at 9-10.] Kelly Aroney's affidavit echoes these sentiments almost identically.

[DE 75-7 at 6.]

This type of generalized statement, without more, is insufficient to oppose a motion for summary judgment. "The nonmovant will successfully oppose summary judgment only when it presents definite, competent evidence to rebut the motion." *Vukadinovich v. Bd. of Sch. Trustees of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (internal quotations and citations omitted); *see also Lawshe v. Simpson*, 16 F.3d 1475, 1478 (7th Cir. 1994) ("[A] scintilla of evidence in support of the non-movant's position is

insufficient to successfully oppose summary judgment; there must be evidence on which a jury could reasonably find for the [nonmovant].").  Michael Aroney fails to provide *any* evidence to rebut the evidence proffered by Garmin that AIM was a mere instrumentality of Michael Aroney, often serving as his own personal piggy bank, and that AIM did not follow the customary corporate formalities.  In fact, in his affidavit, Michael Aroney says that he "do[es] not have documentation to confirm the purpose or business basis for each transfer or expense payment" and "cannot recall the specific purpose for each transfer or expense payment Garmin has identified."  [DE 75-6 at 9.] Instead, Michael Aroney makes the general assertion that there were many instances where he was paid or reimbursed for the cost of travel and meals, implying that some of those instances account for some the transactions reflected in the bank records, but does not (and cannot) identify a single payment in the dozens of pages of bank records where such a payment or reimbursement was made.  Such a general assertion is inadequate to oppose a motion for summary judgment.  *Green v. Ziegelman*, 310 Mich. App. 436, 461, 873 N.W.2d 794, 808 (Mich. Ct. App. 2015) (piercing the corporate veil where there was evidence to support an inference that the sole owner used the entity to cover his personal expenses notwithstanding his testimony that the expenses were all related to his effort to find business for the entity).

What's more, Michael Aroney's assertion that the payments from AIM's account to his home mortgage lender should be classified as a loan if they cannot be classified as part of his AIM compensation in no way relieves him of the responsibility to present

definite and competent evidence of that fact, such as a contract or promissory note. The totality of the evidence supports the conclusion that Michael Aroney operated AIM as a mere instrumentality.

The record also supports the conclusion that Michael Aroney exercised his control over AIM in a manner that caused a wrong against Garmin. A breach of contract is considered a wrong for purposes of veil-piercing analysis. *See Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 799 (6th Cir. 2007); *Tredit Tire & Wheel Co. v. Regency Conversions, LLC*, 636 F. Supp. 2d 598, 602 (E.D. Mich. 2009). Here the arbitrator found that AIM breached the License Agreement when it failed to pay the contracted-for $100,000 Golden Master Fee and licensing fees and awarded Garmin damages, which this Court confirmed. [DE 57-1 at 9-11.] AIM's breach of its contractual obligations to Garmin under the License Agreement is sufficient to establish this element of the veil-piercing analysis. In his opposition to Garmin's motion for partial summary judgment, Michael Aroney argues that the corporate veil should not be pierced because Garmin was not relying on AIM's ability to pay under the License Agreement because all of AIM's payment obligations were transferred and assigned to Expresso HK. [DE 74 at 17-18.] This argument, however, is a non-starter because, as I just stated, this issue was resolved at arbitration (where, notably, AIM argued that Expresso HK *had not* assumed AIM's payment obligations) with the arbitrator finding that AIM, Expresso HK, and Expresso Indiana were jointly and severally liable to Garmin for their breach of the License Agreement. [DE 57-1 at

14.] AIM is on the hook for the arbitration award. The only issue before me is whether

Michael Aroney is as well, and I find that he is.

Finally, Garmin will suffer unjust loss or injury unless the corporate veil is

pierced. Despite being awarded damages by the arbitrator and this Court confirming

the award, Garmin has not yet recovered any portion of the damages owed to it. The

evidence shows that Michael Aroney, acting as AIM, caused those damages and

breached the License Agreement by failing to pay the Golden Master Fee and licensing

fees while using AIM to pay his personal expenses. It would be unjust to allow Michael

Aroney to continue to hide behind a sham entity to prevent Garmin from recovering the

loss caused by him. *See Green*, 873 N.W.2d at 811 (finding that it would consummate

the wrong that the sole owner perpetrated through his control of the entity if the

corporate veil was not pierced to hold the owner liable for uncollectible damages). For

these reasons, AIM's corporate form is to be disregarded, and Michael Aroney is jointly

and severally liable for the arbitration award entered against AIM and confirmed by

this Court.

Now having ruled on the first three counts of the second amended complaint, I

turn to the attachment claim found in Count IV. [DE 57 at ¶¶ 50-55.] None of the

parties moved for summary judgment on this issue or even acknowledged it in their

briefing or the proposed pretrial order [DE 83]. While I take this to mean this count is

no longer at issue, I ask that within ten days of entry of this opinion and order, the

parties file a notice apprising the Court of its status.

## CONCLUSION

For the foregoing reasons, Michael and Kelly Aroney's motions for summary judgment on Count III of the second amended complaint [DE 67, 68] are **GRANTED** and Garmin's motion for partial summary judgment on Count II of the second amended complaint [DE 72] is **GRANTED**.

Michael and Kelly Aroney's joint motion for authority to file supplemental affidavit in support of motions for summary judgment [DE 79] is **DENIED AS MOOT.**

The parties are **ORDERED** to file a notice within **TEN DAYS** of entry of this opinion and order apprising the Court of the status Count IV of the second amended complaint.

**SO ORDERED.**

Entered: June 1, 2016

      s/Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT